UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AWILDA PIMENTEL, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. |
| v. | ) ) | 23-11005-FDS |
| AMGUARD INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, C.J.**

This is an action for declaratory judgment, breach of contract, and violation of Mass. Gen. Laws ch. 93A, arising out of a dispute over a homeowner's insurance coverage. Jurisdiction is based on diversity of citizenship.

Plaintiff Awilda Pimentel purchased a new home on June 28, 2022. The same day, she purchased a homeowner's policy from defendant AmGuard Insurance Company. The policy took effect on June 28, and included coverage for fire losses. On July 22, 2022, less than a month later—and before she had moved in—a fire significantly damaged the structure.

The standard homeowner's insurance policy used by AmGuard provides that coverage applies to the "residence premises," defined in substance as the "dwelling where you reside." An endorsement to the policy amended that definition to the "dwelling where you reside . . . on the inception date of the policy period."

It is undisputed that the "inception date" of the policy was June 28, and that the fire occurred on July 22. Nonetheless, AmGuard denied Pimentel's insurance claim. It did so on the

ground that she did not "reside on" the premises at the time of the fire.  Pimentel had owned the property for only 24 days when the fire occurred; she had not yet moved in any furniture and had not yet spent the night there.  According to AmGuard, as a result, coverage never attached to the structure.  Put another way, AmGuard's position is that coverage is not available unless and until the new homeowner physically occupies the structure and sets up a household.  There are, however, multiple problems with that position.

To begin, the policy does not actually say what AmGuard claims that it says.  Again, the policy states that coverage applies to the dwelling where Pimentel "reside[d]" on the "inception date of the policy period," *not* the date that she moved her belongings in and set up a household.  That "inception date" was June 28.  AmGuard's position ignores the "inception date" language entirely.

AmGuard's position also conflicts with the vacancy exclusion provision of the policy.  That provision excludes coverage if the property is vacant for more than 60 consecutive days.  That means, in practice, that a new homeowner has 60 days from the date of the purchase to move in before the vacancy exclusion applies.  But AmGuard's position renders that a nullity; it contends that because Pimentel's property was still vacant 24 days after purchase, she did not yet "reside" in it, and therefore coverage never attached.

AmGuard's position has substantial adverse consequences for purchasers of homes in Massachusetts.  Among other things, it means there is never insurance coverage between the day of the closing (that is, the moment the new house is purchased) and the day the new owner actually moves in (which is not normally the same day as the closing).  It is fair to say that no reasonable purchaser of a new homeowner's policy would anticipate that gaping hole in her insurance coverage.

In any event, the critical question is what it means to "reside" in a property on the "inception date." The term "reside" is not defined anywhere in the policy. One possible way to interpret that language is to read it literally—that is, to conclude that Pimentel was required to set up a household on June 28, the very day she closed on the property, or coverage would never attach. That would lead to a number of absurd consequences, as explained below.

There is, however, a sensible way to interpret the policy language. That is to conclude that the policy covered the dwelling beginning on June 28—provided that Pimentel purchased the property as her residence, not as a commercial, investment, rental, or vacation property, and further provided that if it was still vacant more than 60 days later, coverage would be excluded.

At the very least, the meaning of the policy is ambiguous, and that ambiguity must be construed against the insurer and in favor of the homeowner. That means that Pimentel—who clearly purchased the property as her residence—had coverage effective on the inception date of June 28, and that the coverage was still in place as of July 22.

Both Pimentel and AmGuard have moved for summary judgment in their favor as to liability. For the reasons set forth below, the Court will find for Pimentel and against AmGuard as to all claims.

**I.     Background**

The following facts are undisputed unless otherwise noted.

**A.     Factual Background**

On June 28, 2022, Awilda Pimentel purchased a house at 23 Redgate Drive in Methuen, Massachusetts, after living for many years at another property in Methuen. (Am. Compl. ¶ 1, 3; ECF 30 at 7). That same day, she filed a homestead declaration pursuant to Mass. Gen. Laws ch. 188 § 3, attesting that she "own[s] the home" at 23 Redgate Drive and "occup[ies] or intend[s] to occupy the home as [her] principal residence." (ECF 34 Ex. A at 1).

Also on June 28, 2022, Pimentel purchased a homeowner's insurance policy from AmGuard Insurance Company to cover the property at 23 Redgate Drive. (ECF 30 at 1). Coverage under the policy was for a period of one year beginning on June 28. (*Id.* at 2).

The policy provided up to $300,000 in coverage for property damage from all causes not otherwise excluded. (Am. Compl. Ex. 1 at 13, 28). That coverage applied to "[t]he dwelling on the 'residence premises' shown in the Declarations." (*Id.* at 22). The policy's Declarations listed the "residence premises" as "23 Redgate Dr., Methuen, MA." (*Id.* at 13).

The main body of the policy defined "residence premises" as "[t]he one-family dwelling where you reside . . . and which is shown as the 'residence premises' in the Declarations." (*Id.* at 21). However, the Residence Premises Definition Endorsement, included at the end of the policy, replaced that definition of "residence premises" to "[t]he one-family dwelling where you reside; . . . on the inception date of the policy period shown in the Declarations and which is shown as the 'residence premises' in the Declarations." (*Id.* at 56). The policy did not define the term "reside." (*Id.* Ex. 1).

The policy also included a provision excluding coverage for any fire loss sustained "while a described building is vacant, whether intended for occupancy by owner or tenant, beyond a period of 60 consecutive days." (*Id.* at 46). That provision tracked the language of the standard insurance policy mandated by statute. *See* Mass. Gen. Laws ch. 175 § 99.

Between June 28 and July 22, 2022, Pimentel never stayed overnight at the house. (ECF 30 Ex. B at 1-2). She did not move any living room or bedroom furniture into it. (ECF 32 Ex. 1 at 2, 3). She did, however, move in some boxes, put some items in the refrigerator, and stocked cleaning supplies. (ECF 32 Ex. 1 at 4; 33 at 2). Each day, she would visit and perform some cleaning. (ECF 30 Ex. B at 2). She removed some trim from the pantry door. (ECF 30 Ex. C at

4

3-4). She planned to do some painting, although the parties contest whether she undertook larger-scale renovations that would have rendered the house uninhabitable. (ECF 30 at 4; 32 at 5-6; 33 at 2).

On July 22, 2022, a fire substantially damaged the house. (ECF 30 at 2-3). The estimated costs of repair totaled $318,767. (Am. Compl. Ex. 3 at 21). That exceeded the maximum value of the dwelling coverage, which was $300,000. (*Id.* Ex. 1 at 13, 28).

Pimentel notified AmGuard of the loss on July 25, 2022. (ECF 30 at 4). She subsequently filed a claim under the policy. (Am. Compl. ¶ 17).

On January 9, 2023, AmGuard denied the claim, primarily on the ground that she "did not reside on the premises at the time of the fire." (*Id.* Ex. 4 at 1). AmGuard asserted that under the policy, "particularly under the Residence Premises Endorsement," a dwelling does not become an "insured location" or "residence premises" until the policyholder resides there. (*Id.* Ex. 4 at 1, 5). It concluded that Pimentel did not reside at the house on the date of the fire because she was "residing elsewhere, . . . construction plans for 23 Redgate had been drawn, and . . . [she had] not requested property coverage that would have attached even if [she had] not yet resided on the premises." (*Id.* Ex. 4 at 5).

Pimentel contested that denial, and on January 30, 2023, sent a demand letter under Mass. Gen. Laws ch. 93A to AmGuard. (*Id.* Ex. 5). AmGuard declined to reconsider its determination. (*Id.* Ex. 6). This action followed.

### B. Procedural Background

Pimentel filed this case in Essex County Superior Court on March 22, 2023. She amended the complaint the following day. The amended complaint asserts claims for declaratory judgment (Count 1), breach of contract (Count 2), and violation of Mass. Gen. Laws ch. 93A

(Count 3). On May 8, 2023, AmGuard timely removed the case. The parties have now cross-moved for summary judgment on all counts.

## II. Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. Analysis

The parties contest whether the policy provided coverage for the fire and, if so, whether the insurer's decision denying coverage was an unfair or deceptive trade practice under Mass. Gen. Laws ch. 93A.

A.      **Declaratory Judgment and Breach of Contract**

In Massachusetts, the interpretation of an insurance policy is a question of law. *Sullivan v. Southland Life Ins. Co.*, 67 Mass. App. Ct. 439, 442-43, (2006); *Norfolk & Dedham Mut. Fire Ins. Co. v. Quane,* 442 Mass. 704, 707 (2004). An insurance policy is to be "construe[d] . . . under the general rules of contract interpretation[,] . . . begin[ning] with the actual language of the policies, given its plain and ordinary meaning." *AIG Property Cas. Co. v. Cosby*, 892 F.3d 25, 27 (1st Cir. 2018) (quoting *Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir. 2000)). "Every word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable . . . without according undue emphasis to any particular part over another," and when in doubt, one must consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355-56 (2009) (internal citations omitted). Furthermore, all ambiguities in an insurance policy "are to be construed against the insurer and in favor of the insured." *U.S. Liability Insurance Co. v. Benchmark Construction Services, Inc.*, 797 F.3d 116, 120 (1st Cir. 2015). An ambiguity "arises when there is more than one rational interpretation of the relevant policy language," but "is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Boston Gas Co.* 454 Mass. at 356 n.32 (internal citations omitted).

As noted, the policy covers certain losses to "[t]he dwelling on the 'residence premises.'" Under the endorsement, the "residence premises" is "[t]he one-family dwelling where you reside . . . on the inception date of the policy period shown in the Declarations and which is shown as the 'residence premises' in the Declarations." (Am. Compl. Ex. 1 at 56). The

7

"residence premises" shown in the "Declarations" is undisputed; it is 23 Redgate Drive in Methuen.

AmGuard's position is that coverage was properly denied because Pimentel "did not reside on the premises at the time of the fire." (Am. Compl. Ex. 4 at 1). That cannot be correct. Again, the policy says that coverage applies to the dwelling where Pimentel "reside[d]" on the "inception date of the policy period." (*Id.* at 56). It does *not* say that coverage applies to the dwelling only after the homeowner actually moves her furniture and other belongings into the house and sets up a household. AmGuard's position ignores the "inception date" entirely, and substitutes a different, and future, moment for the effective date of coverage. That position is not grounded in the actual language of the policy, and indeed ignores AmGuard's own endorsement. No objectively reasonable insured would interpret the policy that way.

As noted, AmGuard's position also ignores the language of the vacancy exclusion provision of the policy. That language is part of the standard policy required by Massachusetts law. *See* Mass. Gen. Laws. ch. 175 § 99.[1] It excludes coverage "while the described premises, whether intended for occupancy by owner or tenant, are vacant or unoccupied beyond a period of sixty consecutive days." *Id.*

In 1996, the SJC held that the 60-day vacancy exclusion does not apply to periods of vacancy beginning before the policy period, unless the policy began as an automatic renewal. *See Pappas Enterprises, Inc. v. Com. & Indus. Ins. Co.*, 422 Mass. 80, 85 (1996). The court concluded that "[i]f a vacancy exists at the inception of coverage, it is hardly reasonable to believe that the coverage should terminate earlier than sixty days later," because "for the

---

[1] The statutorily defined insurance policy sets "mandatory minimum coverage." *Aquino v. United Prop. & Cas. Co.*, 483 Mass. 820, 826 (2020). That means than an insurer "cannot limit coverage to a scope narrower than what the Legislature envisioned." *Id.* (quoting *Surrey v. Lumbermens Mut. Cas. Co.*, 384 Mass. 171, 177 (1981)).

premium paid, the insurer has agreed to assume for sixty days the increased risk of loss that vacant premises present." *Id.* at 83-84. Thus, "the vacancy exclusion does not apply when the loss occurred within sixty days of the effective date of the policy." *Id.* at 84.

*Pappas* thus holds that the vacancy exclusion does not apply to a newly-acquired (or newly-insured) property until the property has been vacant for 60 days. *See id*. But AmGuard contends that if an insured property is vacant immediately after its acquisition—for even a single day—then coverage never attaches and the 60-day exclusion is irrelevant.[2] Put another way, even though the vacancy exclusion cannot directly limit coverage within the first 60 days of a policy period, AmGuard contends that it can indirectly create such an exclusion using the definition of "residence." That is not a reasonable construction of the policy.[3]

What, then, does it mean to "reside" in a dwelling "on the inception date of the policy"? The "inception date of the policy" is undisputed; it is June 28, 2022, 24 days before the fire. Whether there was coverage on July 22, 2022, therefore depends on whether Pimentel "resided" in the dwelling on that date.

Again, the term "reside" is not defined in the policy. One way to interpret that language is to give it a narrow and literal meaning, and conclude that the policy only covers a dwelling that is physically occupied by the homeowner—that is, a structure into which the homeowner has moved and set up a household—on the actual inception date.

---

[2] It would appear that under AmGuard's interpretation, if a new homeowner moved in some possessions, spent a single night at the property, and then moved out for a period 59 days, coverage would exist—but if she failed to "reside" at the property for that single day, it would not.

[3] To find otherwise would arguably conflict with the minimum coverage required by Massachusetts law. *See Aquino*, 483 Mass. at 826. Furthermore, "it is wholly inconsistent with [the law's] broad remedial purpose to permit the insurer to evade mandated coverage by erecting an artificial, arbitrary barrier to recovery." *Surrey*, 384 Mass. at 177.

If, indeed, "reside" has that meaning, some odd consequences would follow. Under that interpretation, a new policyholder must move into her new home before midnight on the "inception date," or else coverage never attaches. (Am. Compl. Ex. 1 at 56). In Pimentel's case, that would mean that if she did not move in on June 28, 2022—the very day she closed on the house—she would never have coverage, no matter what happened later. Depending on the time of day the closing occurred, she might have had only a matter of hours to take up "residence" in the new property before the clock struck midnight and the "inception date" had passed.

That is not what an objectively reasonable new homeowner would likely conclude based on the policy language, particularly when language is considered in light of common sense and practical considerations. Consider, for example, the following hypothetical. A person closes on the purchase of a house late in the day on September 1. She has purchased a policy from AmGuard with a policy period beginning that same day. She has taken the normal steps that a person would take when moving, such as transferring utility services, changing her address on accounts and subscriptions, filing a change-of-address form with the post office, and arranging for her furniture and other possessions to be moved into the house. As of 5:00 p.m. on September 1, she owns the house. Perhaps she is planning to move in first thing on the morning of September 2. Or perhaps the moving van is not scheduled to arrive until September 3. Or perhaps, like many people, she intends to do some painting and perform minor repairs on the property, and does not intend to move any furniture into the house until September 15. Regardless of the reason, she does not sleep in her new house on the night of September 1. That night, the house burns down.

Is the loss covered? The hypothetical reasonable homeowner would surely expect that it was. She did not purchase the property as an investment or as a second home; she intended to

live there. She had not yet cooked a meal or taken a shower or slept in the house, but only because it was not yet practicable to do so. She likely had given up her former residence, perhaps because her lease had expired or because she had sold the property where she had lived; she may have been staying with friends or family, or even in a motel. If asked at the closing on the afternoon of September 1 whether she had insurance on the property—which, in the overwhelming majority of cases, would have been a requirement imposed by her mortgage lender—she would surely have responded in the affirmative.

The narrow construction of "reside . . . on the inception date" therefore leads to somewhat bizarre results. If coverage depends entirely on where the policyholder has set up a household on the "inception date"—which is a single period of 24 hours—it does not matter whether she moves into the house the very next day, some later day, or not at all; the property will never be covered. Thus, even if the hypothetical policyholder moved in the day after she closed, and the structure burned down eleven months later, there would be no coverage, because the policyholder did not "reside" in the house on the "inception date." Many policyholders would therefore pay a year's premium for coverage that never came into being.

That is an absurd result. No objectively reasonable purchaser of such a policy would expect that coverage would attach on June 28, but only if she actually took up residence before the stroke of midnight that night, and otherwise never at all.

There is, however, a way to construe the policy that takes into account all of its language, and comports with the objectionably reasonable expectations of a policyholder. That interpretation is the following: coverage for the dwelling is provided as of the inception date—provided that the policyholder intends to occupy the dwelling as a residence (as opposed to a

11

commercial, investment, rental, or vacation property), and further provided that if the property is vacant for more than 60 days, the exclusion will apply.

Under the circumstances, and at a minimum, the policy's definition of "reside" is ambiguous. In Massachusetts, ambiguities in insurance contracts are construed against the insurer. *See Boazova v. Safety Ins. Co.*, 462 Mass. 346, 350–51 (2012) ("When the policy language is ambiguous, 'doubts as to the intended meaning of the words must be resolved against the insurance company that employed them and in favor of the insured.'") (quoting *August A. Busch & Co. of Mass. v. Liberty Mut. Ins. Co.*, 339 Mass. 239, 243 (1959)).

Construing the ambiguity here in favor of plaintiff, she did "reside" at 23 Redgate Drive "on the inception date of the policy." It is undisputed that she purchased the property as a residence and intended to move in to the property as her principal home. Therefore, 23 Redgate Drive was, in fact, the "residence premises" under the policy—that is, the place where Pimentel resided as of the inception date of the policy. It is also undisputed that the fire occurred 24 days after the inception date. Accordingly, the plaintiff's fire loss is covered, and summary judgment as to Counts 1 and 2 will be granted in favor of plaintiff and against AmGuard.

B. **Consumer-Protection Claim**

The parties have also cross-moved for summary judgment on the claim of unfair or deceptive trade practices in violation of Mass. Gen. Laws ch. 93A. Plaintiff challenges both defendant's inclusion of the Residence Premises Definition Endorsement in its policy and its interpretation of the endorsement in a manner unfavorable to her.

Chapter 93A, § 2 provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. To determine whether a business practice is unfair under Chapter 93A, the court must consider "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2)

whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). In cases involving insurance disputes, liability under Chapter 93A may be triggered by "an absence of good faith and presence of extortionate tactics." *Guity v. Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 344 (1994). For example, courts have upheld findings of liability under Chapter 93A where an insurance company refused to settle a theft claim based on its unfounded suspicion of the claimant's veracity; had a company-wide policy of refusing to settle all but small claims prior to litigation; or refused to provide coverage after a judicial determination that coverage applied. *Id.* (citing *Wallace v. American Mfrs. Mut. Ins. Co.,* 22 Mass. App. Ct. 938, 939 (1986); *Whyte v. Connecticut Mut. Life Ins. Co.*, 818 F.2d 1005, 1011 (1st Cir. 1987); *Shapiro v. American Home Assur. Co.*, 616 F. Supp. 906, 918-19 (D. Mass. 1985)).

### 1. Inclusion of the Endorsement

Plaintiff first contends that the inclusion of the endorsement, which limits coverage to the "dwelling where you reside . . . on the inception date of the policy period," violates Chapter 93A because it conflicts with the vacancy provision of the standard policy. *See* Mass. Gen. Laws ch. 175, § 99.

Including a provision that violates a standard insurance policy is not a *per se* Chapter 93A violation. *See Aquino*, 483 Mass. at 837. Instead, an unauthorized provision in an policy violates Chapter 93A only if it is not based on "a plausible, reasoned legal position." *Id.*

Here, it is not obvious that the endorsement violates the standard policy. As discussed above, the term "reside," in the context of policy, is ambiguous. If the endorsement language is construed to mean "intend to reside," there is no inconsistency between that meaning of the endorsement and the vacancy provision of the standard policy. *See* Mass. Gen. Laws ch. 175,

13

§ 99. If a person can "reside" at a place that is technically vacant "on the inception date of the policy," then there is no inherent conflict. *See Pappas*, 422 Mass. at 83-84.

Furthermore, AmGuard had a "plausible, reasoned" legal basis for including the endorsement in the policy, based on the Massachusetts Division of Insurance's apparent approval of the language. *See Aquino*, 483 Mass. at 837.[4] While the Commissioner of Insurance cannot approve an insurance provision that fails to meet minimum-coverage requirements, his apparent approval of the endorsement is at least some evidence that the Division of Insurance did not view the endorsement as circumventing the protections of the standard policy. *See McGilloway*, 488 Mass. 610, 614 (2021) (explaining that "an advisory ruling promulgated by the commissioner . . . interpreting a provision in the standard policy, is entitled to deference as an agency decision" but finding *de novo* the meaning of a provision in the absence of an advisory ruling).[5]

In any event, the Court cannot say that the inclusion of the endorsement in AmGuard's policy is an unfair or deceptive trade practice. The real issue is not the inclusion of the endorsement, but its interpretation. Accordingly, the mere inclusion of the endorsement did not violate Chapter 93A.

### 2. Interpretation of the Endorsement Against Plaintiff

Plaintiff further argues that AmGuard's interpretation of the endorsement is an unfair and deceptive trade practice.

---

[4] AmGuard apparently intended to attach the approval as Exhibit 1 to the affidavit of Hali Young (ECF 30 Ex. M). Although the approval was not attached and is therefore not a part of the record, plaintiff does not contest that the approval occurred, only whether it was reasonable for AmGuard to rely on it. (ECF 30 at 7; ECF 33 at 2.).

[5] AmGuard also defends its use of the endorsement, in part, in the statutory authorization to "print or use in its policies printed forms of description and specification of the property or interest covered." (ECF 28 at 9) (quoting Mass Gen. Laws ch. 175 § 99). The authorization to "print or use in its policies printed forms of description and specification of the property or interest covered" does not allow an insurer to limit the scope of covered property if those limitations are inconsistent with the requirements of the standard policy. The authorization is more naturally read as permission to tailor the standard policy to each customer's specific property or interest.

Chapter 93A does not impose liability in cases of good-faith disputes over insurance coverage in which "liability was not reasonably clear." *Guity*, 36 Mass. App. Ct. at 343. Such disputes do not constitute unfair or deceptive trade practices, even when a court ultimately overrules insurer's denial of the claim, as long as the insurer's denial was made in good faith, relied upon a plausible interpretation of the policy, and was not otherwise immoral, unethical, or oppressive. *See id.* ("A plausible, reasoned legal position that may ultimately turn out to be mistaken—or simply . . . unsuccessful—is outside the scope of the punitive aspects of the combined application of c. 93A . . ."); *Bos. Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 406 Mass. 7, 15 (1989) ("In good faith, [the insurer] relied upon a plausible, although ultimately incorrect, interpretation of its policy. There is nothing immoral, unethical or oppressive in such an action . . . . We hold that [the insurer] did not engage in unfair or deceptive acts.").

AmGuard's interpretation of the endorsement is not plausible. The endorsement substituted "the dwelling where you reside on the inception date of the policy period" for "the dwelling where you reside." AmGuard then interpreted the endorsement in a way that ignored the language of its own endorsement—the "inception date of the policy period."—altogether. And that interpretation also ignores the policy's vacancy exclusion provision, as interpreted by the SJC in *Pappas*. Under the circumstances, AmGuard's interpretation of the amendment to deny coverage is "otherwise . . . oppressive" and constitutes an unfair or deceptive trade practice. *Guity*, 36 Mass. App. Ct. at 343.

It is also noteworthy that AmGuard collected a premium for coverage that (in its view) never vested. And it did so without advising or warning Pimentel that there would be no

15

coverage until she "resided" in the dwelling, according to an undisclosed and uncertain set of criteria. That, too, is an unfair and deceptive trade practice that violates Chapter 93A.

Plaintiff's motion for summary judgment on Count 2 will therefore be granted.

### 3. Damages

There is not sufficient evidence from which a reasonable factfinder could conclude that any violation of Chapter 93A was knowing or willful, so plaintiff may not recover multiple damages. *See* Mass. Gen. Laws Ann. ch. 93A, § 9. But the plaintiff is entitled to recover her actual damages, which appear to equal her $300,000 policy cap, as well as reasonable attorney's fees and expenses. *See id.*

The parties will have 21 days from the date of this order (that is, by November 14, 2024) to submit supplemental briefing and affidavits on the precise amount of plaintiff's damages, including actual damages, reasonable attorney's fees, and expenses.

## IV. Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED, and defendant's cross-motion for summary judgment is DENIED.

**So Ordered.**

Dated: October 23, 2024

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court